UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                    :
EMEL DILEK,                                          :
                              Plaintiff,            :
                                                    :          11 Civ. 2980 (JPO)
              -against-                              :
                                                    :          MEMORANDUM AND
WATSON ENTERPRISES, INC.,                            :              ORDER
                              Defendant.            :
                                                    :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

> *"As you will see, it's not all about the money in life: it's about health,*
> *love, respect, happiness and then at some point about the money, which is*
> *the only thing that will survive all of us."*
> —Plaintiff Emel Dilek[1]

       This is a contract case.  It concerns a Connecticut company and one of the company's

employees.  That employee worked for a number of years at-will, but she then signed, along with

the company's chief operating officer, an employment agreement guaranteeing her four years in

her position at the company.  She and the COO were also lovers.  When the COO passed away a

year and a half into the agreement's four-year term, the company fired the employee, and she

now sues for breach of contract.  The company argues that the agreement is invalid and

countersues, asserting that the employee contributed no value to the corporate enterprise but

instead spent her days shopping on the company credit card in Manhattan and travelling the

world on frequent vacations.

       The employee is Plaintiff Emel Dilek, who filed her complaint in this action on May 3,

2011.  (Dkt. No. 1. ("Compl.").)  She alleges breaches of contract and of the duty of good faith

---

[1] (Email from Emel Dilek to Kitt Watson (Aug. 25, 2011, 7:56 AM EDT), Dkt. No. 23-7 ("August 25, 2011 Dilek Email"), at 2 of 9, appended as Ex. 7 to Declaration of Nicholas M. Reiter in Support of Watson's Motion for Summary Judgment, Dkt. No. 23 ("Reiter Decl.")).

and fair dealing by the company, her former employer, Defendant Watson Enterprises, Inc.

("Defendant" or "WEI" or the "Company").  (*Id.*)  WEI's two counterclaims against Dilek allege

unjust enrichment and civil theft and were filed on July 29, 2011.  (Defendant's Amended

Answer and Counterclaims, Dkt. No. 10 ("Ans.").)  Currently before the Court are three motions:

WEI's motion for summary judgment as to Dilek's claims (Dkt. No. 21); Dilek's motion for

summary judgment as to her contract claim *and* WEI's counterclaims (Dkt. No. 36); and Dilek's

motion for sanctions against WEI and its counsel on the ground that their counterclaims against

Dilek are frivolous (Dkt. No. 41).  For the reasons discussed below, WEI's motion for summary

judgment is denied; Dilek's motion for summary judgment is denied in part and granted in part;

and Dilek's motion for sanctions is denied.

## I.      Background

       This background statement of facts is drawn primarily from the four Rule 56.1 statements

submitted by the parties.

### A.      Watson Enterprises, Inc.

       Beginning in 1983, Defendant Watson Enterprises, Inc. operated a car dealership under

the trade name Mercedes-Benz of Greenwich.  (Watson's Statement Pursuant to Local Civil Rule

56.1 in Support of Its Motion for Summary Judgment, Dkt. No. 48 ("WEI 56.1 Statement"), ¶¶ 1,

3; Plaintiff's Response to Defendant's Statement Pursuant to Local Civil Rule 56.1, Dkt. No. 60

("Dilek 56.1 Counterstatement"), ¶¶ 1, 3.)  In 1995, the sole shareholder of WEI, Arthur "Kitt"

Watson ("Watson"), sold a twenty-five percent share in the Company to Ronald Pecunies, who

became WEI's chief operating officer ("COO").  (WEI 56.1 Statement ¶¶ 4, 7; Dilek 56.1

Counterstatement ¶¶ 4, 7; Stock Purchase Agreement including Shareholders' Agreement, Dkt.

No. 10-1 ("Stock Purchase Agreement"), § 8.3, appended as Ex. 1 to Watson's Amended

Answer and Counterclaims, Dkt. No. 10).  Their agreement provided that "except as otherwise provided herein, decisions relating to day-to-day operations of the Corporation shall be determined by the holder(s) of the majority of the shares of the Corporation" and further provided that "[i]t [is] of the essence of this Agreement that [Pecunies] be active in the day to day management of the Corporation, and that [he] use due diligence and his best efforts and make the Corporation financially successful . . . ."  (Stock Purchase Agreement §§ 7.6(e), 8.3.)

In practice, Watson's responsibilities at WEI included speaking to his accountant, signing payroll checks, and checking the books of the Company.  (Deposition Transcript of Arthur Watson ("Watson Tr.") at 14:21-15:14, appended as Ex. 11 to Declaration of Elissa Fudim in Support of Plaintiff's Motion for Summary Judgment ("Fudim Decl.").)  In the last five years of his presidency at WEI's Mercedes dealership (which ended July 18, 2011), Watson traveled to the dealership three or four times per month.  (*Id.* at 8:13-20, 15:15-23.)

**B.     Enter Emel Dilek**

Dilek and Pecunies first met on January 28, 2004, and they began a romantic relationship shortly thereafter.  (WEI 56.1 Statement ¶ 16; Dilek 56.1 Counterstatement ¶ 16.)  On October 3, 2005, Plaintiff began living together with Pecunies at an apartment he leased at 220 Central Park South in New York City.  (WEI 56.1 Statement ¶ 17; Dilek 56.1 Counterstatement ¶ 17.)  On or about October 10, 2005, WEI hired Dilek as its Business Development Center Manager with a starting salary of $60,000.  (WEI 56.1 Statement ¶ 18-19; Dilek 56.1 Counterstatement ¶ 18-19; Notice of Wages and Benefits, Dkt. No. 23-4 ("Employment Letter Agreement"), appended as Ex. 4 to Reiter Decl.)  Dilek asserts that it was Pecunies who hired her.  (Declaration of Emel Dilek, Dkt. No. 39 ("Dilek Decl."), ¶ 3.)  Plaintiff's Employment Letter Agreement provided that WEI

adheres to a policy of **employment-at-will**.  Either the employee or the Company
is at will to terminate the employment relationship at any time, with or without
cause.  Upon termination for any reason the Company will not pay accrued but
unearned benefits.

(Employment Letter Agreement at 2 (emphasis in original).)  The letter agreement also

delineated WEI's vacation and personal time policy, which allowed Plaintiff certain limited

amounts of paid time off.  (*Id.* at 1.)  The letter agreement provided that its "terms . . . may be

changed at any time, with or without notice, at the sole discretion of the management of Watson

Enterprises Incorporated."  (*Id.* at 2.)

> ### C.      Dilek's Accolades, Recognition, and Compensation

In 2006, Dilek's salary was raised from $60,000 to $100,000 per year.  (Dilek's

Statement of Material Facts Pursuant to Local Rule 56.1, Dkt. No. 38 ("Dilek 56.1 Statement"), ¶

12; Watson's Counterstatement of Facts Pursuant to Local Civil Rule 56.1 in Opposition to

Plaintiff's Motion for Summary Judgment, Dkt. No. 53 ("WEI 56.1 Counterstatement"), ¶ 12.)

In 2007, her salary was raised again to $120,000 per year plus additional benefits.  (Dilek 56.1

Statement ¶ 14; WEI 56.1 Counterstatement ¶ 14.)  Dilek was informed of these raises by

Pecunies and the dealership's general manager, Russ Baird.  (Declaration of Emel Dilek, Dkt.

No. 39 ("Dilek Decl."), ¶¶ 5, 6; Dilek 56.1 Statement ¶¶ 13, 15; WEI 56.1 Counterstatement ¶¶

13, 15.)  Also in 2007, Dilek was promoted from Business Development Center Manager to

Business Development and Marketing Manager.  (Dilek 56.1 Statement ¶ 16; WEI 56.1

Counterstatement ¶ 16.)  She was informed of that promotion by Pecunies.  (Dilek Decl. ¶ 6;

Dilek 56.1 Statement ¶ 17; WEI 56.1 Counterstatement ¶ 17.)

During her tenure at WEI, Dilek received numerous certifications in the Mercedes-Benz

Standards of Excellence Program.  (Dilek Decl., Exs. 1-4; Dilek Decl. ¶ 6; Dilek 56.1 Statement

¶¶ 18-22; WEI 56.1 Counterstatement ¶¶ 18-22.)  On June 27, 2008, she received an email

4

message from WEI's president, Watson, telling her "[t]hank you Emel for doing a bang up job two thumbs up." (Email from Watson to Dilek, dated June 27, 2008, appended as Ex. 6 to Dilek Decl.) She received another email from Watson on November 18, 2008, which concluded, "Keep up the good work." (Email from Watson to Dilek, dated November 18, 2008, appended as Ex. 5 to Dilek Decl.; Watson Tr. 54:17.) During her employment at WEI, Dilek never received notice that there was any problem with her job performance. (Dilek 56.1 Statement ¶ 44; WEI 56.1 Counterstatement ¶ 44.) WEI paid Dilek her salary without complaint or reservation from January 2005 to August 2010. (Watson Tr. 69:20-70:10, 57:10-12, 66:20-67:5; Dilek 56.1 Statement ¶ 52; WEI 56.1 Counterstatement ¶ 52.)

### D.   Dilek's Dereliction

During her employment with the Company, Dilek and Pecunies took numerous vacations together throughout the world. (Deposition Transcript of Emel Dilek ("Dilek Tr.") at 85:19-91:24, 94:13-99:20, appended as Ex. 2 to Reiter Decl.)

With Pecunies's permission, Dilek used his company credit card, and then her own company credit card, from 2007 until Pecunies's death in May 2010. (Dilek 56.1 Statement ¶¶ 54-56; WEI 56.1 Counterstatement ¶¶ 54-56.) The Company deducted from Pecunies's earnings amounts that Pecunies or Plaintiff identified as personal charges to those cards. (Dilek 56.1 Statement ¶¶ 57-59; WEI 56.1 Counterstatement ¶ 58.) WEI asserts that Pecunies had not repaid WEI for all of Dilek's personal credit card expenses before the time he died. (WEI 56.1 Counterstatement ¶ 61-62; Dilek 56.1 Statement ¶ 62 (partially agreeing).) Watson testified that WEI sought reimbursement for those charges in an arbitration against Pecunies's estate. (Watson Tr. 75:2-8, 76:3-9.) WEI and Pecunies's estate reached a confidential settlement of that arbitration in December 2011. (Declaration of Nicholas M. Reiter in Further Support of

5

Watson's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary

Judgment, Dkt. No. 50 ("2d Reiter Decl."), ¶ 20.)

       Watson asserts that Dilek's company credit card use was improper.  His deposition

testimony includes the following exchange:

> Q:    When did you first become aware that Ms. Dilek was, in your words,
>       misusing the company credit card?
> A:    Pretty near from the start.
> Q:    So from around 2005?
> A:    Yes.

(Watson Tr. at 69:20-25.)  In a declaration submitted with WEI's motion papers, Watson has

asserted that, although he "was aware during Plaintiff's employment that she, on occasion, used

Mr. Pecunies's corporate credit card," he "did not learn until shortly before Mr. Pecunies's death

in May 2010 of the considerable number of purchases Plaintiff made using the Company's

corporate credit card."  (Declaration of Arthur K. Watson in Further Support of Watson's Motion

for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No.

51 ("2d Watson Decl."), ¶ 4.)

       WEI asserts that the Company paid Dilek's mobile phone bills.  (Declaration of John Cox

in Support of Watson's Motion for Summary Judgment and in Opposition to Plaintiff's Motion

for Summary Judgment, Dkt. No. 52 ("Cox Decl."), ¶¶ 6-7; WEI 56.1 Counterstatement ¶ 64

(citing WEI financial documents, Dkt. No. 40-3 ("WEI Financial Documents"), appended as Ex.

13 to Fudim Decl., at WATSON 0000692-0000719).)  Dilek concedes that WEI paid her mobile

phone bills but avers that Pecunies charged those bills to the Company without her knowledge.[2]

(Dilek Decl. ¶ 30.)  However, WEI has submitted email messages apparently from Dilek to other

Company personnel directing that they pay certain phone bills, partially with corporate funds.

---

[2] There is some confusion in Plaintiff's moving papers on this point.  Though Plaintiff herself admits that WEI paid her phone bills (Dilek Decl. ¶ 30), Plaintiff's Rule 56.1 Statement states that "Pecunies paid the bills for Dilek's mobile phone."  (Dilek 56.1 Statement ¶ 64 (citing Dilek Decl. ¶ 30).)

(2d Reiter Decl., Ex. 3.)  The first email, dated April 23, 2008, has the subject line "phone bill —
please read asap—thanks a lot!!!!" and calls for a check to be written for $537.30.  (*Id.* at 2.)
The email also includes instructions that "[o]ut of that [amount] charge Ron $302.99 and charge
the company $234.31."  (*Id.*)  That bill appears to be reflected in Company financial records as
an expense of $234.31 and an advance of $302.99, both dated April 26, 2008 and both labeled
"AT&T MOBILITY—EMEL PHONE."  (WEI Financial Documents at WATSON 0000695.)
The second email, dated November 18, 2008, calls for payment of an "ATT bill" for $807.02 and
includes the message, "Ron had high bill cause he was in Bermuda."  (2d Reiter Decl., Ex. 3, at
1.)  That bill appears to be reflected in Company financial records as a Company expense, dated
November 18, 2008, for $807.02 for "AT&T MOBILITY—EMEL'S PHONE."  (WEI Financial
Documents at WATSON 0000702.)

   **E.**  **The 2009 Employment Agreement**

   On or about January 1, 2009, Pecunies (purportedly on behalf of WEI) and Dilek signed
an employment agreement, which provided that Dilek would continue for a four-year term of
employment as WEI's Business Development Center and Marketing Manager.  (Compl. ¶ 11;
Employment Agreement, appended as Ex. 1 to Compl; Dilek 56.1 Statement ¶¶ 28-29; WEI 56.1
Counterstatement ¶¶ 28-29.)  The Employment Agreement promised Dilek "an annual (gross)
salary of ONE HUNDRED TWENTY [*sic*] ($120,000.00) DOLLARS," in addition to
commissions and other benefits.  (Employment Agreement at 1.)  The Employment Agreement
called for Dilek to pay the Company consideration of one dollar.  (*Id.*)

   Dilek testified that she was aware that Watson sometimes prohibited Pecunies from firing
certain employees at WEI, though Pecunies wanted to do so.  (Dilek Tr. 60:4-23, 58:4-59:7; *see
also* August 25, 2011 Dilek Email at 3-4 of 9.)  Dilek did not ask Pecunies whether he had

authority to enter into the Employment Agreement or whether he had discussed the Employment

Agreement with Watson.  (Dilek 56.1 Statement ¶¶ 35-36; WEI 56.1 Counterstatement ¶¶ 35-

36.)  When asked at her deposition whether Watson had said or done "anything that made you

think he had authorized Mr. Pecunies to offer you an employment contract," Dilek answered, "I

don't remember."  (Dilek Tr. at 63:3-10.)

  **F.**  **The End of Dilek's Employment**

  In October 2009, Pecunies was diagnosed with pancreatic cancer, and the Company

granted Dilek leave as of May 7, 2010.  (Dilek 56.1 Statement ¶¶ 66-67; WEI 56.1

Counterstatement ¶¶ 66-67.)  During her leave, Dilek traveled to Germany and also attended the

2010 Cannes Film Festival in France.  (WEI 56.1 Statement ¶ 55; Dilek 56.1 Counterstatement ¶

55.)

  Pecunies died on May 22, 2010.  (WEI 56.1 Statement ¶ 51; Dilek 56.1 Counterstatement

¶ 51.)  On August 26, 2010, WEI terminated Dilek's employment.  (WEI 56.1 Statement ¶ 56;

Dilek 56.1 Counterstatement ¶ 56.)  When asked at his deposition what his basis had been for

terminating Dilek, Watson answered, "[t]hat I don't want my ex-partner's girlfriend working for

me.  Or fiancee, excuse me."  (Watson Tr. at 80:2-4.)

## II. Legal Standard for Summary Judgment

  Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007)

(internal quotation marks and citation omitted).  "A fact is 'material' when it might affect the

outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted).

When determining whether a genuine dispute of material fact exists, a court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993)) (internal quotation marks not referring to quotation from *Heublein* omitted).

## III.  Discussion

The parties agree that Connecticut law governs this action.  Accordingly, the Court may apply Connecticut law without engaging in a choice-of-law analysis. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (Even "implied consent is sufficient to establish choice of law." (internal quotation marks and ellipses omitted)).

This discussion addresses in turn (1) Dilek's motion and WEI's cross-motion for summary judgment as to Dilek's claims; (2) Dilek's motion for summary judgment as to WEI's counterclaims; and (3) Dilek's motion for sanctions.

###### A.      Breach of Contract and of the Duty of Good Faith and Fair Dealing

Under Connecticut law, "[t]he elements of a breach of contract action are the formation

of an agreement, performance by one party, breach of the agreement by the other party and

damages." *Rosato v. Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004) (internal

quotation marks omitted).  Plaintiff's claim for breach of the duty of good faith and fair dealing

(addressed by WEI's summary judgment motion but not Dilek's) is considered together with her

contract claim because both of these claims depend upon the existence of an enforceable contract

between the parties.  *See Macomber v. Travelers Property & Cas. Corp.*, 261 Conn. 620, 638

(2002) ("As our case law makes clear, no claim for breach of the duty of good faith and fair

dealing will lie for conduct occurring prior to, or during, the formation of a contract.").

Here, the parties' dispute centers on whether Pecunies had authority sufficient to bind

WEI to the Employment Agreement and, as a result, whether the signing of the Employment

Agreement was the formation of a valid contract that was binding on WEI.  The Connecticut

Supreme Court has held that, generally, "the principal in an agency relationship is bound by, and

liable for, the acts in which his agent engages with authority from the principal, and within the

scope of the agent's employment." *Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 508

(2010) (internal quotation marks, alterations, and citation omitted).  But as a threshold matter, the

parties dispute which of them bears the burden to show that such authority did or did not exist.

###### 1.      Burden of Proof Concerning Pecunies's Authority

Plaintiff correctly notes that, under New York choice-of-law rules, the parties' choice of

law governs substantive but not procedural issues.  *See Phillips v. Audio Active Ltd.*, 494 F.3d

378, 384-85 (2d Cir. 2007) (citing *Woodling v. Garrett Corp.*, 813 F.2d 543, 551-52 (2d Cir.

1987)).  "The question of burden of proof . . . is regarded by New York law as a question of

procedure to which the law of the forum applies." *Woodling*, 813 F.2d at 552; *see also Bensen v. American Ultramar*, 1997 U.S. Dist. LEXIS 1608, at *47 n.26 (S.D.N.Y. Feb. 13, 1997).

New York law on the burden of proof as to a corporate official's contracting authority today remains largely as it was explained by Judge Learned Hand in 1934: "whatever powers are usual in the business may be assumed to have been granted; but the presumption stops there, as much in the case of a president as of any other officer, though naturally in degree they may greatly differ." *Schwartz v. United Merchants & Mfrs., Inc.*, 72 F.2d 256, 258 (2d Cir. 1934). Thus, a corporate official's authority to bind a corporation without express say-so "exists only as to matters which are 'usual' or 'ordinary,' and . . . the burden rests upon the party challenging the [official's] authority to show that the transaction was 'unusual' or 'extraordinary.'" *Pettit v. Doeskin Products, Inc.*, 270 F.2d 95, 99 (2d Cir. 1959). The Second Circuit has more recently elaborated that

> [u]nder New York law it is settled that, in order to bind a corporation to an "extraordinary" or "unusual" contract entered into between a corporate official and another party, it is necessary to show that the official had express authority to enter into the contract. *Pettit v. Doeskin Prods., Inc.*, 270 F.2d 95, 99 (2d Cir. 1959), *cert. denied*, 362 U.S. 910, 80 S. Ct. 660, 4 L. Ed. 2d 618 (1960); *see also Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 23-24 (2d Cir. 1974); *Schwartz*, 72 F.2d at 258. In *Pettit*, we noted that "what is usual or ordinary necessarily depends on the circumstances of the particular case." 270 F.2d at 99.

*Burke v. Bevona*, 931 F.2d 998, 1001 (2d Cir. 1991) (citation omitted in part).

Thus, WEI bears the burden to show that the contract is unusual. Only if WEI carries that burden, Dilek then bears the burden to show that Pecunies had authority to bind WEI in the Employment Agreement. If WEI does not show that the contract is legally unusual, then WEI bears the burden to prove its affirmative defense that Pecunies lacked the relevant authority. *See Barton Group, Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) ("[A] defendant

asserting an affirmative defense bears the burden of proof with respect to that defense." (citation omitted)).

Cases discerning whether contracts are ordinary focus chiefly on the terms of the agreements and on industry practices.  In the Second Circuit's *Burke* case, cited above, the plaintiff was suing for breach of an oral contract for lifetime employment with a labor union. *Burke*, 931 F.2d 998.  The Second Circuit held that the contract was extraordinary because (1) lifetime employment agreements are *per se* unusual under New York law and (2) such contracts are even more unusual when concluded with labor unions, "which are, by law, democratic organizations" where a single official would likely lack independent authority to execute such an agreement.  *Id.* at 1001-02; *see also Betz v. Legal Aid Soc'y*, 806 F. Supp. 485, 490 (S.D.N.Y. 1992) (granting defendant summary judgment where plaintiff had failed to demonstrate agent's authority to offer a lifetime employment contract); *Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan, Inc.)*, 204 B.R. 378, 380 (Bankr. S.D.N.Y. 1997) (requiring plaintiff to show authority where "a brief but unusual letter agreement . . . guaranteed [the plaintiff], who was in his early forties, lifetime employment and, when he was terminated, entitled him to some $23 million").

Most decisions ignore the particular principal's practices in determining whether an agreement is unusual, but some decisions do consider those practices.  *See, e.g.*, *Sequa Corp. v. Gelmin*, No. 91 Civ. 8675 (DAB), 1996 U.S. Dist. LEXIS 19802 (S.D.N.Y. Dec. 31, 1996) (corporation challenging agreement's validity had "failed to establish as a factual or legal matter that [the agreement] was 'extraordinary', 'unusual', or outside of the ordinary course of [the corporation's] business").

As Plaintiff argues, the Employment Agreement here was "a facially enforceable *written* contract for *a term of years*, signed by *Defendant's COO*, which promised *reasonable*, not extraordinary compensation.  There is nothing unusual about the contract on its face."  (Pl.'s Reply Br., Dkt. No. 61, at 2.)  Certainly, in a general sense, there is nothing extraordinary about a corporate executive concluding an employment agreement with an employee.  However, beyond the innocuous face of the contract, there are two ways in which the Employment Agreement could be called unusual.  First, it contravened or changed WEI's policy of at-will employment, and second, it was executed by Pecunies and Dilek, who were lovers.

To the extent that the corporate practices of WEI in particular are relevant, Watson asserts that the Company had never before offered any employee a guaranteed term of employment.  (Declaration of Arthur K. Watson in Support of Watson's Motion for Summary Judgment, Dkt. No. 23-1 ("Watson Decl."), appended as Ex. 1 to Reiter Decl., ¶ 15.)  And indeed, Plaintiff's original Employment Letter Agreement provided that WEI "adheres to a policy of **employment-at-will**."  (Employment Letter Agreement at 2 (emphasis in original).)  But the Employment Letter Agreement also provided that its "terms . . . may be changed at any time, with or without notice, at the sole discretion of the management of Watson Enterprises Incorporated."  (*Id.*)  Thus, as embodied in the Employment Agreement Letter, WEI's policy was employment-at-will unless and until management chose a different policy.  Pecunies was clearly "management of Watson Enterprises Incorporated."  As stated in the Employment Letter Agreement, the Company's malleable policy does not, on its own, make the contract legally extraordinary.

Then there are the noteworthy circumstances of Dilek's relationship with Pecunies.  Ultimately, however, these special circumstances make it appear more obvious, not less, that

WEI allowed Pecunies a free hand in setting the terms of Dilek's employment.  Not only had

Pecunies informed Dilek of her promotion in 2007 and, together with Baird, informed her of her

raises in 2006 and 2007, but Watson also testified repeatedly in his deposition that he did not

involve himself in Dilek's employment situation precisely because she was romantically

involved with Pecunies.  To wit:

> Q:    You agree with the statement that in the five years that Ms. Dilek was
>        employed by Watson Enterprises she provided no benefit whatsoever to
>        Watson Enterprises?
> A:    I don't believe she did.
> Q:    You continued to pay her during that time period?
> A:    It was Ron's girlfriend.
> Q:    Is that a yes?
> A:    Yes.

(Watson Tr. at 66:20-67:5.)

> Q:    Did you ever put Ms. Dilek on written notice of her abuse of fringe
>        benefits?
> A:    No.  She was going out with Ron.

(*Id.* at 61:5-7.)

> Q:    Do you know how much money Ms. Dilek was earning when she was
>        hired by Watson Enterprises?
> A:    I don't know.  Once again, Ron's girlfriend.

(*Id.* at 67:9-12.)

> Q:    Do you know how much money she was earning at any point during her
>        employment?
> A:    No.  Ron's girlfriend.

(*Id.* at 68:7-9.)

> Q:    You have no knowledge of whether she received a raise?
> A:    No.  Ron's girlfriend.

(*Id.* at 68:13-15.)

> Q:    Did you ever notify Ms. Dilek of the problems you were experiencing
>        with her management style?

A:      I wasn't going to touch that with a ten-foot pole.

Q:      That's a no?

A:      That's a no.

(*Id.* at 47:6-12.)

Thus, while the circumstances surrounding this contract are unusual in a theatrical sense—indeed, they are worthy of a made-for-television movie—the contract itself is not unusual in the relevant legal sense.  Accordingly, Plaintiff does not bear the burden to prove Pecunies's authority to bind WEI.  Rather, in raising an affirmative defense that Pecunies lacked such authority, Defendant bears the burden to prove as much.  *See Barton Group, Inc.*, 796 F. Supp. 2d at 498.

### 2.      Pecunies's Authority

The Connecticut Supreme Court has held that "[a]n agent's authority may be actual or apparent."  *Ackerman*, 298 Conn. at 508 (internal quotation marks, alterations, and citation omitted).  As discussed below, genuine disputes of material fact exist as to both Pecunies's actual authority and his apparent authority with regard to Dilek's Employment Agreement.

### i.      Actual Authority

"Actual authority may be express or implied."  *Maharishi Sch. of Vedic Scis., Inc. (Conn.) v. Conn. Constitution Assocs. Ltd. P'shp*, 260 Conn. 598, 607 (Conn. 2002) (citation omitted).  "Implied authority is actual authority circumstantially proved.  It is the authority which the principal intended his agent to possess."  *Id.* (internal quotation marks and citation omitted).  "Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent."  *Id.* (internal quotation marks and citation omitted).

15

WEI asserts that Pecunies lacked actual authority to bind WEI in an employment agreement for a term of years.  In support of this assertion, WEI points to (1) its company-wide policy of at-will employment; (2) the Stock Purchase Agreement's grant of superior power to Watson and inferior power to Pecunies; and (3) acknowledged limitations on Pecunies's authority in matters of employment and human resources, noting in particular that Watson had prohibited Pecunies from terminating certain employees.  Plaintiff argues that Pecunies had implied actual authority to bind WEI with the Employment Agreement.  She notes (1) that Pecunies informed Dilek of her promotion and, with Baird, of her raises and (2) that Watson took an entirely hands-off approach to Dilek's employment and delegated such matters to Pecunies.[3]

The evidence behind these assertions is sufficient to create genuine issues of material fact as to whether authority to offer the Employment Agreement was "authority which the principal [WEI] intended [its] agent [Pecunies] to possess." *Maharishi Sch. of Vedic Scis., Inc.*, 260 Conn. at 607 (citation omitted).  Accordingly, neither party is entitled to summary judgment as to Pecunies's actual authority.

### ii.    Apparent Authority

Under Connecticut law,

> apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses.  Consequently, apparent authority is to be determined, not by the

---

[3] Plaintiff argues that Watson had established a division of authority under which Pecunies had a free hand to manage Dilek's employment affairs and Watson had a free hand to manage his own wife's employment affairs; per Watson's deposition testimony:

| | |
|---|---|
| Q: | How many days a week did your wife, Diane, come into work . . . [a]fter you were married? |
| A: | She wasn't working there . . . . |
| Q: | What positions, if any, did she have after you were married in Watson Enterprises? |
| A: | None. |
| Q: | Did she receive any paychecks from Watson Enterprises? |
| A: | Yes, she did. |
| Q: | For doing what? |
| A: | Because she's my wife. |

(Watson Tr. at 59:9-60:10.)

agent's own acts, but by the acts of the agent's principal.  The issue of apparent authority is one of fact to be determined based on two criteria.  First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted the agent to act as having such authority.  Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action.

*Ackerman*, 298 Conn. at 508-09 (internal quotation marks, alterations, and citation omitted).

Generally, "[e]ven where a party is an actual agent, another party dealing with that agent has an affirmative duty to inquire as to the scope of the agent's authority.  A party must display that degree of common sense which distinguishes good faith from blind faith."  *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, No. CV89-036 34 96 S, 1993 WL 301011, at *3 (Conn. Super. Ct. July 28, 1993), *aff'd*, 231 Conn. 276, 649 A.2d 518 (1994) (internal quotation marks, alterations, and citation omitted); *see also Hollywyle Ass'n, Inc. v. Hollister*, 164 Conn. 389, 397, 324 A.2d 247, 252 (1973).  However, "[a]pparent authority may be derived from a course of dealing," *Edart Truck Rental Corp. v. B. Swirsky & Co.*, 23 Conn. App. 137, 140 (Conn. App. Ct. 1990) (citing 3 Am. Jur. 2d, Agency § 79), apparently such that the duty to inquire evaporates, *see Feilbogen v. AIG Trading Group, Inc.*, 2006 U.S. Dist. LEXIS 29184 (D. Conn. May 15, 2006) (not requiring inquiry and holding that, "[b]y designating Finigan as the person with whom Feilbogen should negotiate regarding his compensation, Trading conveyed the impression that Finigan could enter into an agreement on its behalf.").

WEI argues that Pecunies had no apparent authority.  The Company notes that (1) WEI had communicated its at-will employment policy to Dilek in the Employment Letter Agreement; (2) Dilek knew of limitations on Pecunies's authority in matters of employment and human resources; and (3) Watson had done nothing to suggest that Pecunies had authority to guarantee an employee a set term of employment.  Supporting Plaintiff's argument for apparent authority is

17

evidence showing (1) that WEI paid her increased salaries after Pecunies informed Dilek of her promotion and, with Baird, of her raises and (2) Watson's substantial delegation to Pecunies in matters relating to Dilek's employment.  The evidence behind the parties' arguments is sufficient to create genuine issues of material fact as to whether WEI "cause[d] or allow[ed] third persons [Dilek] to believe [its] agent [Pecunies] possesse[d]" authority to offer the Employment Agreement.  *Ackerman*, 298 Conn. at 508.

Further, genuine issues of material fact exist as to whether Dilek's prior course of dealings with WEI, particularly Watson's delegation of her employment matters to Pecunies, excused her failure to inquire into the Company COO's authority to offer her an employment contract for a term of years.

Because genuine issues of material fact exist as to whether Pecunies had apparent authority to bind WEI with Dilek's Employment Agreement, neither party is entitled to summary judgment on this point.

### 3.    Agent Actions Adverse to Principal

Under Connecticut law, "when a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the agent's guilty knowledge or disloyal, predatory conduct to his corporate principal."  *Reider v. Arthur Andersen, LLP*, 47 Conn. Supp. 202, 211, 784 A.2d 464, 470 (Super. Ct. 2001).  "Unless the agent's activity in pursuit of that scheme somehow benefits the corporation, the corporation cannot be made responsible for the agent's fraud."  *Id.*

Defendant argues that, in concluding the Employment Agreement with a derelict employee, Pecunies was acting in a manner adverse to the interests of WEI.  But Dilek has

adduced evidence that she received numerous certifications in the Mercedes-Benz Standards of

Excellence Program; received email messages from Watson lauding her job performance; and

never received notice of any deficiency in her job performance.  This evidence is enough to raise

a genuine issue of material fact as to whether Pecunies was acting in WEI's interests to retain a

valuable employee or against WEI's interests and in his own or Dilek's interests to do well by

his fiancée.  The Court cannot conclude as a matter of law either that Dilek was a worthless

employee whose retention would necessarily be adverse to WEI's interests or that Pecunies was,

in fact, acting in the Company's interests.  Accordingly, no party is entitled to summary

judgment on this point.

### 4.    Consideration

Under Connecticut law, "the general rule [is] that in the absence of consideration an

executory promise is unenforceable.  Consideration consists of a benefit to the party promising,

or a loss or detriment to the party to whom the promise is made."  *State Nat. Bank of Connecticut*

*v. Dick*, 164 Conn. 523, 529 (1973) (citation omitted).  Some Connecticut decisions have gone

quite far in stating that "[i]t is well established that continued employment, as opposed to new

employment, is not adequate consideration."  *Hoffnagle v. Henderson*, No. CV020813972S,

2003 WL 21150549 (Conn. Super. Ct. Apr. 17, 2003) *on reconsideration in part*, No.

CV020813972, 2003 WL 22206236 (Conn. Super. Ct. Sept. 10, 2003).  Other decisions have

hedged that "[c]ontinued service by an employee may constitute sufficient consideration for

certain contractual agreements."  *J.M. Layton & Co., Inc. v. Reid Millar*, CV040084446S, 2004

WL 1966290, at *5 (Conn. Super. Ct. Aug. 9, 2004).

This hedging is appropriate because the reason continued employment is generally

insufficient for consideration is that "[a] modification of an agreement must be supported by

valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." *Thermoglaze, Inc. v. Morningside Gardens Co.*, 23 Conn. App. 741, 745, 583 A.2d 1331, 1333 (1991) (citation omitted). "It is an accepted principle of law in [Connecticut] that when a party agrees to perform an obligation for another to whom that obligation is already owed, although for lesser remuneration, the second agreement does not constitute a valid, binding contract." *Id.* (citation omitted). Thus, there may be consideration where an existing employee agrees with her employer to alter the terms of her employment, with changes to the entitlements and obligations of each.

Here, before the Employment Agreement, Dilek was an at-will employee. Both she and WEI held the power "to terminate the employment relationship at any time, with or without cause." (Employment Letter Agreement at 2.) If the Employment Agreement was a valid contract, it changed the entitlements and obligations of both Dilek and WEI, binding each to a four-year term of employment. (Employment Agreement.) WEI promised to employ Dilek for that period, and Dilek promised to work for that period.

Thus, notwithstanding Dilek's promise within the Employment Agreement to pay WEI one dollar, Dilek's and WEI's mutual promises to continue the employment relationship for four years constitute both benefit and detriment to each party. *See State Nat. Bank of Connecticut*, 164 Conn. at 529; *cf. Coelho v. Posi-Seal Int'l, Inc.*, 208 Conn. 106, 118-19 (1988) ("[W]e adopt the position endorsed by the more recent cases from other jurisdictions that the absence of a separate consideration does not inevitably invalidate a contract otherwise expressing an intention that employment not be terminable at will."); *Fahim v. CIGNA Investments, Inc.*, No. 3:98CV232, 1998 WL 1967944, at *3 (D. Conn. Sept. 10, 1998) ("Plaintiff's continued

employment itself is enough consideration for the new contract of employment which is subject to the added terms.").

Accordingly, Plaintiff is entitled to summary judgment on the proposition that the Employment Agreement is not invalid for lack of consideration.

### B.      WEI's Counterclaims

Dilek has also moved for summary judgment as to WEI's two counterclaims: one for unjust enrichment and one for civil theft pursuant to Conn. Gen. Stat. § 52-564.  Each of these counterclaims asserts, in short, that Dilek unlawfully collected money from WEI during her employment.

#### 1.      Unjust Enrichment

"To prevail on a claim of unjust enrichment, [the claimant] must prove (1) that the [accused was] benefited, (2) that the [accused] unjustly did not pay the [claimant] for the benefits, and (3) that the failure of payment was to the [claimant's] detriment."  *Hall v. Bergman*, 296 Conn. 169, 182 n.7, 994 A.2d 666 (2010) (internal quotation marks omitted).  Plaintiff argues first that WEI cannot collect on its unjust enrichment because the Company voluntarily paid Dilek her salary.

##### a.      Voluntary Payment

"[V]oluntary payment defeats any claim [a] plaintiff might have as to unjust enrichment." *Trenwick Am. Reinsurance Corp. v. W.R. Berkley Corp.*, No. UWYX-01-CV-094019148S, 2011 WL 1565889, at *23 (Conn. Super. Ct. Apr. 1, 2011) (citing *Rockwell v. New Departure Mfg. Co.*, 102 Conn. 255, 128 A. 302 (1925)).  The voluntary payment doctrine applies where the party seeking recovery has "full knowledge of all the facts, and in the absence of fraud or

improper conduct on the part of the payee." *Id.* (quoting 70 C.J.S. 99-100, *Payment*, § 121 (2005)).

In its counterclaim for unjust enrichment, WEI alleges that Dilek "did not provide any benefit to [WEI] in light of her frequent dereliction of duties . . . including her regular tardiness and absenteeism, abuse of fringe benefits, misappropriation of Defendant's funds, poor management style, lack of qualifications, fraudulent conduct, and improper use of company property."  (Ans. ¶ 21 at page 9 of 12.)  Thus, WEI asserts, it was "unfair, unjust, and inequitable" for Dilek to be enriched when WEI paid her "an annual salary of One-Hundred Twenty-Thousand Dollars ($120,000) payable in weekly installments, commission payments, and health insurance coverage."  (*Id.* ¶¶ 20, 23.)  For the purposes of her motion for summary judgment as to this counterclaim only, Dilek assumes *arguendo* that the factual allegations in this paragraph are true.  (Pl.'s Br., Dkt. No. 37, at 23 n.9.)

WEI points to an internal WEI email message sent under the subject line "More Emel Dilek Issues," dated August 24, 2010 (two days before Dilek's termination).  The email reflects that the Company had received notification that its account with an internet marketing firm had been cancelled because "[a]pparently, Emel would add anyone and everyone she could to our mailing list without them opting-in."  (Email from Joseph Fioretti to Mark Juron, Lou Liodori, and John Kovarik (Aug. 24, 2010, 10:18 AM), appended as Ex. 2, Dkt. No. 50-6, to 2d Reiter Decl.)  The email states that the marketing company "said that the spamming violations from the past were so egregious that they couldn't reinstate the account!"  (*Id.*)

This email notwithstanding, WEI and particularly its president, Watson, had full knowledge of the material facts it alleges during the period when the Company paid Dilek her salary.  Watson testified in his deposition that, despite his belief that she provided no value to the

Company, WEI continued to pay Dilek during her five years of employment because she was romantically involved with Pecunies.  (Watson Tr. at 66:20-67:5.)  His deposition also included the following exchange:

> Q:      What did Ms. Dilek do on a regular basis for her responsibilities?
> A:      I don't recall.
> Q:      You don't recall any of her responsibilities?
>           [Defendant's counsel]: Objection.
> A:      Yes, I do.  She used to sleep with Ron.

(*Id.* at 31:22-32:5.)

He similarly testified that he did not put Dilek on written notice of her abuse of fringe benefits because "[s]he was going out with Ron."  (*Id.* at 61:5-7.)  He testified that he was first aware of her misuse of Company credit cards near the beginning of her employment in 2005.  (*Id.* at 69:20-25.)  He testified that he received complaints about her poor management style from "everyone" at the Company, "[a]nyone that had to deal with her," and he identified five such complainants by name.  (*Id.* at 46:5-21.)  He also testified that he and his managers had discussed whether to put Dilek on notice of problems with her attendance:

> A:      It was discussed.  I don't think it was ever done. . . .
> Q:      Who were the other managers that discussed it?
> A:      Basically everyone that saw it that worked there.
> Q:      How do you know those conversations took place?
> A:      Because I was in the middle of them.

(*Id.* at 42:24-43:19.)  He also testified that his responsibilities at WEI included speaking to his accountant, signing payroll checks, and checking the books of the Company.  (*Id.* at 14:21-15:14.)

WEI asserts that Watson's belief in Dilek's non-contribution was formed after Watson, in 2010, learned the full extent of Dilek's misconduct.  (Def.'s Reply and Opp. Br., Dkt. No. 49, at 20-21.)  This assertion is unavailing because, when asked in his deposition whether WEI

continued to pay Dilek, Watson responded in the affirmative that Dilek was "Ron's girlfriend"—he did not testify that he had mistakenly believed or had been misled to believe that her job performance was satisfactory.  (Watson Tr. at 66:20-67:5.)

Additionally, WEI's motion papers included a declaration from Watson asserting that, though he "was aware during Plaintiff's employment that she, on occasion, used Mr. Pecunies's corporate credit card," he "did not learn until shortly before Mr. Pecunies's death in May 2010 of the considerable number of purchases Plaintiff made using the Company's corporate credit card."  (2d Watson Decl. ¶ 4.)  "In addition to her frequent absenteeism related to her use of the corporate credit card and her many vacations, I learned after Plaintiff went on medical leave in May 2010 that she and Mr. Pecunies used [WEI]'s funds to pay for her domestic and international cellular phone costs."  (*Id.* ¶ 8 (citation omitted).)

Watson's recent disavowals that he knew of the full extent of Dilek's dereliction are of no weight.  "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) (citing *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996); *see also Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

WEI, through its principal, had materially full knowledge of the facts it alleges about Dilek's job performance.  Though examples of that dereliction may have continued to come to light over the course of Dilek's employment, Watson knew too much to deny that his Company,

aware of the material facts, voluntarily paid Dilek her salary.  Accordingly, Defendant is barred from recovering the wages it paid Dilek during her employment with the Company.

### b.        Waiver

It also appears that WEI's counterclaim for unjust enrichment is barred by the doctrine of waiver.  Waiver is the "intentional relinquishment of a known right."  *Olean v. Treglia*, 190 Conn. 756, 772, 463 A.2d 242, 251 (1983) (citation omitted); *see also Berger v. Balmar Marine of Canton, Inc.*, No. CV 90-0441360S, 1992 WL 49979, at *5 (Conn. Super. Ct. Feb. 28, 1992) ("If an employer retains an employee after he has knowledge of misconduct warranting [the employee's] discharge, such retention is prima facie a waiver, and condonation is presumed, unless circumstances are shown that tend to establish a reasonable and proper reason for the delay." (internal quotation marks and citation omitted)).  Here, Watson claims to have known of Dilek's various forms of dereliction throughout her employment, but WEI continued to pay her a salary for five years.  WEI has waived any claim for unjust enrichment concerning Dilek's salary based on the misconduct here alleged.

### 2.        Civil Theft

Connecticut's civil theft statute provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."  Conn. Gen. Stat. § 52-564.  "Statutory theft under § 52-564 is synonymous with larceny under [Connecticut's criminal law]."  *Suarez-Negrete v. Trotta*, 47 Conn. App. 517, 520, 705 A.2d 215, 218 (1998) (internal quotation marks and citation omitted).  The criminal law provides that "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."  Conn. Gen. Stat. § 53a-119.

> The elements of larceny include: (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of the consent of the owner . . . .   Consequently, a conviction for larceny [cannot] stand . . . [when the] property is taken with the knowing consent of the owner . . . .  Felonious intent as applied to larceny means that there is no color of right or excuse for the act.

*State v. Carcare*, 75 Conn. App. 756, 777, 818 A.2d 53, 66-67 (2003) (internal quotation marks and citation omitted) (bracketed alterations in original).  However,

> '[n]otwithstanding the general rule that larceny is not committed by a taking which is accomplished with the consent or acquiescence of the owner of the property, the offense is larceny if the owner of goods parts with the possession only, for a particular purpose, and the person who receives the possession avowedly for that purpose has a fraudulent intention to make use of it as the means of converting the goods to his own use, and does so convert them, for in such case the fraud supplies the place of the trespass in the taking, or as otherwise stated, the subsequent felonious conversion of the property by the alleged thief will relate back and make the taking and conversion larceny.'

*State v. Vars*, 154 Conn. 255, 261, 224 A.2d 744, 747 (1966) (quoting 32 Am. Jur., *Larceny*, § 31).  The standard for proving civil theft is preponderance of the evidence. *See Stuart v. Stuart*, 297 Conn. 26, 44, 996 A.2d 259, 270 (2010).

WEI alleges that Dilek committed civil theft by (1) receiving and retaining wages despite her alleged dereliction of duties; (2) making personal charges to the corporate credit cards issued to Pecunies and herself; and (3) using her company-paid mobile telephone to make personal calls.

### a.      Wages

As discussed above, with materially full knowledge of Dilek's dereliction, WEI voluntarily paid Dilek's salary.  Thus, WEI consented to Dilek's taking, obtaining, and retaining her wages.  The fraud exception to the consent rule does not apply because (1) WEI was parting with title to the salary funds, not possession only and (2) there has been no showing that Dilek

26

had a fraudulent intention to convert the funds to her own use, especially since, according to Watson, her absenteeism, poor job performance, and relationship with Pecunies were on full and open display.

There is also no evidence of *felonious* intent on Dilek's part. As one Connecticut court has explained,

> [f]or a larceny there must be a specific intent to deprive an owner wrongfully of property. After a falling out between business people, a dispute as to prior disbursements of funds should not without more establish larceny by one who operates under an honest but even mistaken belief as to his or her right to have received such disbursements.

*Lapuk v. Simons*, No. PJR CV93 0704542S, 1995 WL 5633, at *11 (Conn. Super. Ct. Jan. 3, 1995), *aff'd*, 41 Conn. App. 750, 677 A.2d 24 (1996).

For the reasons stated above, there can be no genuine dispute of material fact on WEI's counterclaim of civil theft as to Dilek's salary. While she may have been getting away with highway robbery in a figurative sense, Plaintiff was not committing civil theft under § 52-564. On this counterclaim, Dilek is entitled to judgment as a matter of law.

### b.    Credit Card Expenses

With Pecunies's permission, Dilek used his company credit card, and then her own company credit card, from 2007 until Pecunies's death in May 2010. (Dilek 56.1 Statement ¶¶ 55-56; WEI 56.1 Counterstatement ¶¶ 55-56). WEI deducted from Pecunies's earnings amounts charged to corporate credit cards that Pecunies or Plaintiff identified as personal charges.[4] (Dilek 56.1 Statement ¶¶ 57-59; WEI 56.1 Counterstatement ¶ 58.) Watson, of course, knew that

---

[4] WEI asserts that Dilek's declaration testimony that Pecunies reimbursed WEI for her personal charges to the corporate credit cards (Declaration of Emel Dilek ¶ 27) contradicts testimony she gave at her deposition that she could not recall whether she made personal charges with the corporate credit card. (WEI 56.1 Counterstatement ¶ 59.) WEI's assertion is based on pages (44-48) of the Dilek deposition transcript which are not in the record. The evidence that is in the record creates no genuine dispute of material fact as to Dilek's intent in making charges to corporate credit cards.

Dilek was (like Watson's own wife) making such personal charges to the corporate cards.[5] (Watson Tr. at 69:20-25.)  There is no evidence that Dilek hid the nature of her personal charges. WEI asserts that Pecunies had not repaid WEI for all of Dilek's personal credit card expenses before the time he died.  (WEI 56.1 Counterstatement ¶ 61-62; Dilek 56.1 Statement ¶ 62 (agreeing in part).)  Watson testified that WEI sought reimbursement for those charges in arbitration against Pecunies's estate.  (Watson Tr. 75:2-8, 76:3-9.)  WEI and Pecunies's estate reached a confidential settlement of that arbitration in December 2011.  (2d Reiter Decl. ¶ 20.)

Even if not all of Dilek's personal charges have been reimbursed, and whether or not WEI has collected from Pecunies's estate on those charges, there is no evidence that Dilek had a fraudulent or felonious intent to permanently deprive WEI of the funds used to pay her personal credit card charges.  Indeed, the evidence shows that her intent was that her personal charges would be reimbursed to the Company by Pecunies.  As felonious intent is a necessary element of civil theft, this counterclaim cannot survive as to Dilek's personal charges to corporate credit cards, and Dilek is entitled to judgment as a matter of law on this point.

### c.    Mobile Phone Expenses

WEI asserts that the Company paid Dilek's mobile phone bills.  Dilek concedes that WEI paid her mobile phone bills but avers that Pecunies charged those bills to the Company without her knowledge.  However, WEI has submitted email messages apparently from Dilek to other WEI personnel directing that they pay certain phone bills, partially with corporate funds.  (2d Reiter Decl., Ex. 3.)

---

[5] Watson's deposition transcript includes the following:
    Q:      Did your wife ever use the company credit card for personal expenses?
    A:      Yes.
    Q:      Were those expenses repaid?
    A:      Yes.
    Q:      Who paid them?
    A:      I did.
(Watson Tr. at 74:16-25.)

Even viewing the evidence in the light most favorable to WEI, there is no evidence of

civil theft with regard to Dilek's mobile phone bills. The evidence merely establishes that Dilek

(and/or Pecunies) presented Dilek's mobile phone bills to WEI and that WEI paid them. WEI

thus consented to payment of Dilek's phone bills. And the fraud exception to the consent rule

does not apply because (1) WEI parted with title to (not merely possession of) the funds used to

pay the phone bills; (2) there is no evidence of a "particular purpose" for which WEI paid

Dilek's phone bills, *i.e.*, no evidence of a WEI policy forbidding personal calls on company-paid

phones; (3) there is no evidence that Dilek promised not to make personal calls from her

company-paid phone or represented that she had not placed such calls; and (4) there is no other

evidence that Dilek had a fraudulent intention in using her phone. Thus, WEI's consent in

paying Dilek's mobile phone bills defeats its counterclaim for civil theft with respect to those

bills.

There is also no evidence that Dilek had a felonious intent when she used her mobile

phone and, *arguendo*, requested that WEI pay the bill. As felonious intent is a necessary element

of civil theft, WEI's counterclaim of civil theft cannot survive as to Dilek's mobile phone bills.

For the reasons discussed above, Dilek is entitled to summary judgment as to WEI's

counterclaim for civil theft as to her salary, her corporate credit card expenses, and her company-

paid cell phone use.

### C.    Sanctions

Federal Rule of Civil Procedure 11(b) provides that

> By presenting to the court a pleading, written motion, or other paper—whether by
> signing, filing, submitting, or later advocating it—an attorney or unrepresented
> party certifies that to the best of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the circumstances:
> > (1) it is not being presented for any improper purpose, such as to harass,
> > cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by
> existing law or by a nonfrivolous argument for extending, modifying, or
> reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so
> identified, will likely have evidentiary support after a reasonable
> opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if
> specifically so identified, are reasonably based on belief or a lack of
> information.

Fed. R. Civ. P. 11(b).

District courts have wide discretion but great responsibility in deciding when to order sanctions under Rule 11. *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir. 1986). Sanctions are appropriate under Rule 11 "where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir. 1989).

Here, Defendant WEI is defeated at the summary judgment stage on both of its counterclaims: unjust enrichment as to Plaintiff's wages and civil theft as her wages, corporate credit card usage, and mobile phone expenses. Defendant's defeat is well deserved. These counterclaims are not just long shots; as a group, they border on the absurd.

On its counterclaims as to Plaintiff's wages, Defendant would have the Court hold that a corporation may spend years reaping benefits from a clearly derelict employee, terminate that employee, and then win repayment of all compensation it paid to the employee. This cannot be and is not the law. If it were, any number of businesses would suddenly have a ready defense to any economic downturn.

The counterclaims as to Plaintiff's credit card and mobile phone expenses are only slightly more colorable. It is certainly possible for a corporate employee to abuse benefits like a

corporate charge card or a company-paid phone. But in this case, evidence of felonious intent is woefully lacking.

All this being said, under existing case law, Defendant has raised arguments that are, while wrong, not entirely unreasonable. On the unjust enrichment counterclaim for repayment of Plaintiff's wages, WEI argued that the voluntary payment doctrine does not apply because that doctrine calls for "full knowledge of all the facts." *Trenwick Am. Reinsurance Corp.*, 2011 WL 1565889, at *23. Defendant's argument fails because WEI *did* have materially full knowledge of all the facts of Plaintiff's alleged dereliction, but it is also true that there is evidence that new examples of that dereliction came to light near the end of Plaintiff's employment. Thus, Defendant's argument was not wholly without basis.

Similarly, on its counterclaims for civil theft, Defendant made the doomed but colorable argument that it lacked sufficient knowledge to have consented to payment of Plaintiff's salary, credit card expenses, and mobile phone bills.

While it appears extremely unlikely that Defendant could have succeeded on any of these arguments, the Court does not conclude as a matter of law that Defendant's counterclaims met the Second Circuit's standard of having "no chance of success." *Int'l Shipping Co., S.A.*, 875 F.2d at 390. Though Defendant's counterclaims here are exceedingly weak ones, they will not be the basis for sanctions.

## IV.   Conclusion

For the foregoing reasons, Defendant WEI's motion for summary judgment is denied. Plaintiff Dilek's motion for summary judgment is (1) granted as to whether there was sufficient consideration for the disputed Employment Agreement; (2) granted as to both of Defendant

31

WEI's  counterclaims; and (3) denied in all other respects.  And Plaintiff Dilek's motion for

sanctions is denied.

      The Clerk of Court is directed to close the motions at docket entry numbers 21, 36, and

41.


SO ORDERED.


Dated:  New York, New York
        August 10, 2012

 

_____
          J. PAUL OETKEN
      United States District Judge